Good morning, Your Honour. May it please the Court. Derek Foran on behalf of the appellant in this matter, Mr. Michael Hedlund. Your Honour, this case presents an issue concerning the dischargeability of student loan debt under Section 523 of the Bankruptcy Code. Section 523 is a remedial provision that Congress enacted in order to allow students to discharge their student debts if they can show that paying the debt would constitute an undue hardship upon themselves and their dependents. The Ninth Circuit has adopted a three-part test, as the Pena case, to determine the dischargeability of such debt. The case is about the proper application of that test. The case is also about the proper application of the standard of review on appeal from a discharge decision. Judge Radcliffe, who is the trial court judge in this matter, the bankruptcy court judge who presided over the trial, ordered a partial discharge of the student loan debt in this case. On appeal, the Bankruptcy Appellate Panel reversed that decision and reinstated the debt in its entirety. Our opposition is the Bankruptcy Appellate Panel heard as a matter of law in reversing Judge Radcliffe and that Judge Radcliffe's partial discharge determination in this case ought to be affirmed. Now, I'd like this morning to try to make three points which I think are ultimately dispositive of this appeal. And the first and most important point I want to make is that Judge Radcliffe's decision is fully consistent with prior Ninth Circuit precedent. The Ninth Circuit has addressed the content of the undue hardship test in several cases. The second point that I have with his decision is that it is he really doesn't wrestle with any math. So I don't know how he got where he got. He doesn't make any findings about which exact expense items are reasonably necessary to meet a minimal standard of living. He just pulls out a number. And that, you know, well, what is your response to that? Well, Your Honor, he made a horse-sense judgment about how much this debtor was able to pay the debt given the expenses and the income in the household. Why shouldn't one go back for a more, you know, discreet finding? To Judge Radcliffe? Yes. Well, I think that's certainly within the Court's discretion. I'm not necessarily sure it's necessary. Let me explain to you how I think he got there. There was evidence in the case that some of these expenses had been picked up after the garnishments had stopped. The debtor in the case conceded that some of these could be curtailed. There was also evidence in the case, however, that the expenses were going to go up in the near future. His family was planning on having another baby. They lived in a two-bedroom apartment. They were going to need a bigger place to live. I think Judge Radcliffe took that into account, as well as ---- Well, it's surmising that he did or he didn't. And so it's very tough to say whether or not any of those would be fairly erroneous. I mean, the debtor did say he could afford the $258 a month. So it's not far from there to $300. You could get there a whole bunch of different ways, either by cutting out a couple of expenses. Sure. Or by having Mrs. Hedlund work. Sure. I mean, there's a lot of ways you can get up to $300, which is more or less the minimum, the lowest figure offered by the creditor. Well, let me approach it this way, Your Honor. First of all, I don't think it's accurate to compare the $300. I don't think it's correct to use that $300 number. Because? The payment on that debt was $800. And there was a specific finding of fact in this case that Mr. Hedlund ---- I don't think it's proper to consider at all what the debt could be renegotiated for. I don't think it's proper to consider the stipulation that was put on file three days before trial in light of the trial court's specific finding of fact that Mr. Hedlund, before lawyers got involved, before he had to file for bankruptcy, picked up the phone and tried to renegotiate this debt with the lender. The lender refused to have anything to do with him at the time. They refused to waive collection fees. They refused to waive penalties. They insisted on a full and complete repayment of the debt on their terms and their terms only. Three ---- Okay. Well, let me rephrase the question. Forgetting the stipulation and putting it aside, why wouldn't $300 or $350 as a payout per month be an equally or more reasonable figure than the $225 that was arrived at by horse sense? Well, I think it's in Judge Radcliffe's discretion to make that determination. If you look at the Ruffino case, the Ruffino case is very closely, factually and legally unappointed. Except there were actual findings there. I'm not sure that ---- There were actual findings there with respect to what expenses were and weren't, you know, appropriate for a minimal standard of living. I'm not sure there were ---- There were specific findings in that case, Your Honor. And I think the trial court looked at the expense schedule in that case. And recall in Ruffino, we're talking about expenses that include tanning salon appointments. We're talking about new car payments. But the bankruptcy court there explicitly found that those were okay. The bankruptcy ---- I mean, if the bankruptcy court had made those findings here, then it would be that case. Well, so I think that's a good way to approach it. According to Ruffino, Judge Radcliffe could have looked at these expenses and said that these expenses are okay. Could have. Well, if that's the case, then why can't Judge Radcliffe make the determination that some of these can be reduced or eliminated without actually making specific findings? I think Ruffino, if you apply Ruffino here and a trial court has the discretion to allow these types of expenses, and some of the expenses that are being questioned in this case have been routinely allowed by both the Ninth Circuit and other circuits. If Ruffino says a trial court has the discretion to allow those expenses, then why can't Judge Radcliffe say, well, some of these can be reduced, which he did and which the debtor agreed to, without having to make specific, concrete findings on that? Well, you know, it just doesn't seem, when you look over the entire record, that your client was making a great effort to pay back these loans. It seemed rather casual about it. I know he had a job, but, you know, if you owe people money, you can get a job working on Saturdays. You can do other things to try to make money. Your Honor, I'm not aware of any case in the undue hardship context that would require a debtor to take on a second job in addition to an already full-time job. A lot of people do that. If people complained that two jobs added up to undue hardship, you'd have the line 10 miles long. It's close. Well, Your Honor, the way I would answer that is I would say there is a remedy here. I mean, if he's really struggling to pay back these loans or meet the needs that he has, then he goes out and he rents a new car and does a few other things. And, I mean, why would you go out and get a new car if you owe all this money? So the way I would answer that is... It's good for the economy, but... Yeah, it's good for the economy, Your Honor. We should all be buying new American cars. But if you look at the Pena case, Your Honor, in Pena there were two debtors in that case. And, again, I think it's important to ground what Judge Radcliffe did here in prior Ninth Circuit precedent. In the Pena case, there were two debtors in the case. They had no dependents. In that case, one of the debtors gets an $8,000 lump sum disability benefit. They go out and buy a second car. They go out and buy a second car in that case. And the panel in that case held it was not clearly erroneous for the trial court to find that the debtor had acted in good faith and warranted a discharge. Now, the headlands, by the way, Klamath Falls, is a small rural town. The nearest freeway is an hour away. Mr. Headland drives a 16-year-old car with 150,000 miles on the odometer, and he needs it for work. His wife has a child. Now, I would respectfully submit that a second car or a family car... What part is he working? I'm sorry? He's a probation officer for the local probation department, Your Honor. He's in court on Mondays, and he visits with the juveniles that are under his care for the rest of the week. He's often required to go out of town on his job, and that's in the record. So he needs his car, his very old car, for his job. And to suggest that a second car in a remote rural town... I don't want to sound like a mean guy, but doesn't the county provide him with a car? Doesn't what? I'm sorry, Your Honor? Does his employer provide him with a vehicle? His employer does not provide him with a vehicle, Your Honor. Also, he's not even allowed to make phone calls, personal phone calls, on the phone system, the cell phone. That's another expense that had been questioned in this case. I think you have to take into account the fact that these folks live in a small, rural, remote town. The notion that Internet connections or cable television or a family car constitute a luxury for this family, when they're paying $350 a month in rent. Overall, they're living modestly and within their means. The notion that these things constitute luxuries I don't think has any support, and it certainly has no support. In the case law, the expenses that have been questioned in this case have routinely been passed upon by the Ninth Circuit and by other courts, and trial courts have the discretion to make a horse-sense judgment about the lifestyle that a debtor is living and about which expenses are reasonable and which are not. And Judge Radcliffe made that determination here. And if you apply Ninth Circuit precedent, I think the only conclusion here is an affirmance of Judge Radcliffe's partial discharge determination. The other point I would like to make very briefly, Your Honor, is that the bankruptcy appellate panel here clearly applied the wrong substantive legal standard. It applied this unconscionability test in reversing the bankruptcy court. Which is only of academic consequence, right, since we review the bankruptcy court. You do review the bankruptcy court, Your Honor, but I think it's important to understand where the BAP went wrong here. The BAP required the headlands to eliminate almost $600 out of their expenses. There's no possible way to get to that number without eliminating the car, without eliminating every dime in the schedule for recreation expenses, without eliminating cable television, Internet, and so on and so forth. That's not what the undue hardship test requires. Five circuits have reached this issue and have held that this standard is far more difficult standard to meet than the undue hardship standard. Has he thought of taking the bar exam again? Your Honor, he doesn't believe he's in a position to take the bar exam again at this point. He's tried twice and failed twice. He studied a third time only for an unfortunate accident preventing him from getting to the exam the third time. The third time he went in to get some coffee and locked himself out of his car. He locked himself out of the car, Your Honor. He couldn't get to the bar exam. He couldn't get to the bar exam. It's like a nightmare. It's a nightmare. And a year later, Your Honor, he's married and he has a child on the way. He can't afford to take two months off without pay to study for the bar. He's in a situation where he believes it's in his best interest to go out and find the best work that he can possibly find, consistent with his credentials, and that is precisely what he did. And the evidence supports that determination. Well, his father is a lawyer, isn't he? His father is a lawyer, Your Honor. His father can't help him for two months so he can pass the bar? His father has contributed financial assistance along the way, Your Honor. But we're talking about a guy now who has a family to take care of. Two months off is just not an option for him at this point. We're talking about a person that graduated in 1997. It's now 2009. He's been a probation officer down in Klamath Falls, an important job, an excellent job, a highly sought-after job, which is the testimony. He's been down there now for 10 or 11 years. The suggestion that he has to switch from that career and go try and take the bar again, I think, is not something that's supported by the record or by the law. And I would submit that Judge Ratcliffe's right. It is something that I've known a number of people who have taken the bar exam three times, four times. They pass, and they're successful lawyers because they have persistence. Absolutely, Your Honor. I see I'm over my time. May I respond to your question? So it's not the case that failure to pass the bar, there's no per se prohibition on law students seeking a discharge of student loan debt under Section 523. I mean, there are cases we see. They're thinking of his own benefit. All right. All right. Thank you, Your Honor. Good morning. Miles Monson for Pennsylvania Higher Education Agency. May it please the Court? Pennsylvania what? Excuse me? What is it called? Higher Education? Pennsylvania Higher Education Agency. I'll refer to it today as FHIA since it's such a long name. Did I say higher education? Correct. They're the student loan lender in this case. So we'll have to just call them Pennsylvania lenders. That would be easier. That would be much easier if they did. The facts in this case, Your Honors, needs to be looked at in terms of Mr. Headland himself. He's a garden variety debtor with a garden variety hardship. That doesn't mean we're not sympathetic to his situation or that it's not tough for him, but it's tough for a lot of debtors. And when you're young, you're healthy, no physical, mental disabilities of any kind, no addictions, no dependence with any difficulties. You work nine to five. You have the ability to work more. You get stronger as you get older. You get stronger as you get older? That's right. Well, I think that's why the BAP found that he had a bright future. And I believe that he has a bright future as well. This case is a case that you have to look at between the difference between a garden variety hardship and an undue hardship. And Congress didn't define what undue hardship was, but this Court has adopted the Brunner test and has gone through the analysis to determine what constitutes undue hardship. It's also important, I think, to point out the fact that where we start. We start with these student loans being presumed to be non-dischargeable. And that's the starting point. A general bankruptcy, the presumption is you're going to get a fresh start and you're going to not have your debts anymore. But with a student loan that the taxpayers have given to an individual with very poor credit, no credit, giving them a chance, giving them an opportunity to have an education, to have a career, that changes the presumption. The burden then shifts to the debtor. And I think as we go through and analyze this case, it's important to point that out, to know where those burdens lie and to see if the debtor, by the preponderance of the evidence, has overcome that presumption. Our position, of course, is that he has not overcome that presumption. What is the interest rate on these loans? I believe that it is 6 or 7 percent. We don't know? That's off the top. I haven't looked at it in a while. But I believe it's in that range. Mr. Monson, if we were to agree with you that either that the findings of the bankruptcy judge are clearly erroneous or that maybe he didn't make enough findings, what do you propose that we should do? Should we ourselves find that he, you know, there's no extraordinary circumstances in order that the entire sum be paid? Or should we remand it to the bankruptcy court to make findings? What do you think we should do? Your Honor, because we believe that the appropriate standard of review for undue hardship is de novo, we think it's important and appropriate for this Court to affirm the decision that his debts not be discharged. What case is that that says it's de novo? Your most recent case is the Mason case that looks at the quote from that case is, quote, But that doesn't mean you review de novo the underlying findings of fact. You're reviewing the ultimate conclusion. Right. De novo. And if I understood it correctly, I believe, and I had the same question. Judge Toshima was inquiring, what do we do if we believe that the bankruptcy court did not actually make sufficient findings of fact and or that those that he – some of those that he did make were clearly erroneous? What do we do if that's what we thought? The bankruptcy courts, Judge Radcliffe in this case, didn't separate out, as the Court knows, the findings of facts from the conclusions of law. And when that happens, it makes it very difficult for a reviewing court to try and pick out and pull out, these are the findings of facts, these are the conclusions of law. In a non-dischargeability context, it is a mixed question of fact and law. I just think you're asking a real simple question. I think it's the same one Judge Toshima was asking. Assume we agree with you that the conclusion of undue hardship can't stand up for whatever the reason, perhaps among them, that there are no findings of fact that are sufficient or that the findings of fact that were made are clearly erroneous. What should we do? Should we remand and let the bankruptcy court revisit it from scratch? Should we ourselves try to make findings of fact? What should we do? I think what you should do is what the appellate court did. Well, they did it wrong. So I don't want to do that. They clearly got the undue hardship analysis wrong. So I don't want to go down that path. Your Honor, but we would agree. We're reviewing the bankruptcy court's ruling directly. We think that the result that the BAP reached was the correct result. And that this Court told you, you know, you're not listening to the question. I apologize, Your Honor. I think this Court can find under de novo review that the debt should be not discharged using de novo review because that's the standard that this Court has set as the standard for undue hardship. And if you look at the entire record, using a de novo review, you can get there. Now, we That doesn't mean that we put ourselves in the lower track finding. That's what we're trying to tell you. The we would not dispute the fact that the record is a mess in terms of the findings of fact. And that is why, you know, this Court has been struggling with that standard review issue. Struggling with it. I'm not struggling with it. What I'm struggling with is what do we do about it? Do we only have one option, dischargeability or no dischargeability? Or do we have another option, which is send it back and let the bankruptcy court start over again and do it right? I definitely think that's an option that this Court has. But I don't believe that it's the appropriate option that should take place in this  case. The Excuse me. Edlin called your company, that's what we understand, and wanted to work out another payment schedule. They just slammed the phone on him. Is that the way they operate? Your Honor, I don't believe that it was as difficult as that. They've made it sound, the other side has made it sound. There was testimony that he tried to negotiate a repayment situation about a year before, and that that was turned down other than the offers that were made to him. He had a couple different offers at that time. But I think what the Court has in front of it as far as the options for repayment is an appropriate place to look to see what both sides agreed would be the repayment option. And, yes, it was done prior to trial, and, yes, it was agreed to by both sides with the assistance of counsel. And so I know Judge Raddick has struggled with the fact that was it an exact replacement for the income contingent program. Well, there's differences between that program, but the essence of what that payment option entailed was an opportunity for him to repay his student loans. Let me ask one final question, and that is, is there any realistic possibility that mediation would be of any assistance? I think there's a very good possibility that that would be helpful. Having the parties sit down together, realizing that, you know, as of July 1st, the government has just come out with brand-new programs for the repayment of student loans to see if he qualified, to see if there might be something that could work out. My client is more than willing to look at those. Mr. Foran? You know, this is a huge problem in our country. It is. You know, these massive student loans put a lot of young people in the role of being in ventured services sometimes for years and years and years of their lives. So something's got to be worked out about that. It does, Your Honor, and I'm concerned about the growing rate of student loans and how high they're getting. The bankruptcy court has provided a mechanism to deal with that, and the end-do hardship is a good one. The end-do hardship mechanism allows the debtor to see if he or she qualifies for a discharge. We don't believe that the unconscionability standard that the other side has proposed is being used in this case or has crept in. If the court would like me to address that, I can. I know I'm out of time. If the court doesn't have any other questions. Okay. Thank you very much. See you later. I'm just curious, what's the interest rate on these loans? 4.22%, Your Honor. It's 4.22%. It's accumulating at a rate of approximately $3,700, $3,800 a year, and it's continuing to do so. The debt's well over $100,000 now. It's completely unfeasible for Mr. Hedlund to pay this debt off. You can't get blood out of a stone. Once again, just to emphasize, if you look at the court's prior precedent, Judge Radcliffe's partial discharge decision there is fully consistent with this court's prior precedent. The standards and the arguments that are being urged on the court by the creditor in this case are really inconsistent and cannot be reconciled with the court's prior precedent. Just to answer Judge Reimer's question, Judge, we're certainly interested in mediation as a possibility. Thank you, Your Honor. Thank you.
judges: Pregerson, Rymer, Tashima